UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

ZURAB KAKUSHADZE, A# 78-704-408,  :

                      Plaintiff,  :

      -against-  :           07 Civ. 8338 (DCF)

          :           ECF Case

MICHAEL CHERTOFF, Secretary of the  :
Department of Homeland Security, and  :
ROBERT MUELLER, Director, Federal Bureau  :
of Investigation,  :

                Defendants.  :

------------------------------------------------------------ x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street
New York, New York 10007
Telephone: (212) 637-2726
Facsimile: (212) 637-2717

DANIEL P. FILOR
Assistant United States Attorney
– Of Counsel –

## TABLE OF CONTENTS

**PAGE**

Preliminary Statement ......................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.    Plaintiff's Claims Against the DHS Should Be Dismissed for
Lack of Subject Matter Jurisdiction ............................................................................ 2

    A.    The Statutory Scheme Prohibits the DHS from Granting Plaintiff
Naturalization While His Name Check Is Pending with the FBI ..................... 2

    B.    The *Mocanu* Decision Was Wrongly Decided .................................................. 3

        1.    The *Mocanu* Court's Interpretation of the Regulatory Scheme
Conflicts with the Vast Majority of Other Courts ............................... 3

        2.    The *Mocanu* Court Impermissibly Usurped an
Administrative Function ....................................................................... 7

    C.    Even If the DHS Were Not Precluded from Adjudicating Plaintiff's
Naturalization Application, Mandamus Jurisdiction Would Fail
Because the DHS Owes No Nondiscretionary Duty ......................................... 8

    D.    No APA Jurisdiction Exists Because There Is No Unreasonable Delay ......... 11

II.    Plaintiff's Claims Against the FBI Should Be Dismissed for
Lack of Subject Matter Jurisdiction .......................................................................... 13

CONCLUSION .................................................................................................................. 15

## PRELIMINARY STATEMENT

Defendants Michael Chertoff, Secretary of the DHS[1] and Robert Mueller, Director of the FBI, respectfully submit this reply memorandum in further support of their motion to dismiss the complaint, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Plaintiff seeks to require the Government to adjudicate and grant his pending N-400 naturalization application, alleging that the pace of the adjudication has been unreasonably slow. As set forth in the Government's initial memorandum, the Court lacks subject matter jurisdiction over plaintiff's claims against the DHS and FBI because neither owes a duty to adjudicate plaintiff's N-400 application at this time. Indeed, the DHS is prohibited by federal regulation from granting naturalization before the FBI has completed a background name check of an applicant. The FBI is continuing to process plaintiff's background check, but due to the number of N-400 applications filed before his, plaintiff's background check has not yet been completed.

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Opp.") argues that the Government lacks authority to conduct a background name check as part of its adjudication of plaintiff's N-400 application. Plaintiff also argues that the 18 months since he filed his N-400 application constitutes an unreasonable delay, warranting mandamus relief that requires the Government to immediately adjudicate that application.

Plaintiff's arguments are without merit and have already been rejected by nearly all courts that have considered the issues. As these courts have found, the statutory framework allows, and indeed requires, the Government to conduct background name checks of all N-400 applicants. In addition, plaintiff cannot identify a single case where a court has found that 18

---

[1] The abbreviations used in the Memorandum of Law in Support of Defendants' Motion to Dismiss ("Govt. Mem.") will also be used in this reply memorandum. The CIS is the division within the DHS that adjudicates N-400 applications, and this memorandum will refer to the DHS and the CIS interchangeably.

months is an unreasonable time period to adjudicate an N-400 application. Accordingly, the Government's motion to dismiss should be granted on behalf of the DHS and the FBI.

## ARGUMENT

**I.  PLAINTIFF'S CLAIMS AGAINST THE DHS SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

### A.  The Statutory Scheme Prohibits the DHS from Granting Plaintiff Naturalization While His Name Check Is Pending with the FBI

Plaintiff argues, based on a single case from outside this Circuit, *Mocanu v. Mueller*, 2008 WL 372459 (E.D. Pa. Feb. 8, 2008), that the FBI's background name check may not be used as a factor in adjudicating plaintiff's N-400 application. *See* Pl. Opp. at 5-8. In making this argument, however, plaintiff, as well as the *Mocanu* court, misinterpret the statutory scheme governing naturalization and fail to consider that scheme in its entirety.

In accordance with the statutory scheme enacted by Congress, the DHS, and before that, the INS, have been required to conduct investigations of each naturalization applicant. Pursuant to the statutory requirements, as part of the investigatory process, the agency has performed a criminal history check (also known as a "fingerprint check") and a background check (also known as a "name check" or a "G-325A check") on all applicants. The INS long considered police department checks and background investigations as part of the investigation of naturalization applicants. *See* Administrative Naturalization, 56 Fed. Reg. 50,475 (Oct. 7, 1991) (codified at 8 C.F.R. § 335.1) (requiring that "the investigation shall consist, at a minimum, of a review of all pertinent records, police department checks, and a neighborhood investigation . . ."). In fact, the INS gave notice beginning in 1995 that a naturalization applicant's Form G-325, or Biographical Information Form, would be used to "check other agency records (FBI, CIA, etc.) on applications or petitions submitted by applicants for benefits under the [INA]. . ." *See*

2

*Information Collections Under Review*, 60 Fed. Reg. 38,371 (July 26, 1995). These checks are considered by the agency to be part of the "examination" and "personal investigation" of naturalization applicants, required by 8 U.S.C. §§ 1443(a) and 1446(a), respectively.

In 1997, Congress mandated that no funds appropriated to the INS be used to complete adjudication of an application for naturalization unless the agency had received confirmation from the FBI that a "full criminal background check has been completed." *See* Pub L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997). In response to Pub. L. No. 105-119, the agency promulgated 8 C.F.R. § 335.2(b), which requires that the "full criminal background check," including FBI checks of both "criminal" and "administrative" records, be completed *before* an interview of the applicant was scheduled. *See* 8 C.F.R. § 335.2(b); 63 Fed. Reg. 12987 (1998). A full and complete background check is also part of the inquiry into whether an applicant possesses good moral character. *See* 8 U.S.C. § 1427(a)(3). Moreover, such checks also assist the DHS in identifying individuals barred from naturalization under 8 U.S.C. § 1424, which is information that would not necessarily be provided in only a criminal history check.

As described in the Government's moving brief, in accordance with the requirement of 8 C.F.R. § 335.2(b) that an applicant cannot be examined for naturalization before the completion of a FBI full criminal background check, many courts have dismissed complaints like plaintiff's for lack of subject matter jurisdiction. *See* Govt. Mem. at 8-9; *see also Wang v. Gonzales*, No. 07-02272, 2008 WL 45492, at *3 (D. Kan. Jan. 2, 2008).

**B.     The *Mocanu* Decision Was Wrongly Decided**

**1.   The *Mocanu* Court's Interpretation of the Regulatory Scheme Conflicts with the Vast Majority of Other Courts**

In *Mocanu*, the court misconstrued the intent of 8 U.S.C. §§ 1443(a) & 1446(a), as well as the Congressional mandate found in Pub L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26,

3

1997), and the regulation interpreting those requirements, 8 C.F.R. § 335.  Where terms of a statute are not defined, a court must construe them in accordance with their ordinary and natural meaning, and the overall policies and objectives of the statute.  *See SUPERVALU, Inc. v. Bd. of Tr. of Southwestern Pa. and Western Md. Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007).  While "statutes [must not be given] a more expansive interpretation than their text warrants . . . it is just as important not to adopt an artificial construction that is narrower than what the text provides." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 558 (2005)).  Here, 8 U.S.C. §§ 1443(a) & 1446(a) and Pub L. No. 105-119, Title I, 111 Stat. 2448 (Nov. 26, 1997) authorize the DHS to conduct "examinations" of applicants for naturalization, including a "personal investigation" and "full criminal background check."  Given the breadth and context of these terms, the DHS's construction of these terms as including an FBI name check is a reasonable one that is well within the plain meaning of the governing statutory and regulatory provisions.

The *Mocanu* court erred in failing to give deference to the agency's interpretation of the applicable statutory provisions and the agency's own regulation that implements those provisions.  *See NRDC v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001) (courts "give deference to the view of the agency tasked with administering the statute, particularly insofar as those views are expressed in rules and regulations that implement the statute").  Courts must defer to the interpretation of the agency charged with enforcing a statute, and may not impose their own interpretation.  *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842 (1984).  Under *Chevron*, if Congress delegates authority to an agency to make rules carrying the force of law and the agency promulgates such rules pursuant to that authority, courts give *controlling weight* to the

4

regulations unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Thus, so long as an agency's construction of a statutory directive, as embodied in a promulgated regulation, is a reasonable construction of the statute, the court will defer to the agency's considered interpretation of the statute. *See id.* at 843-44. Similarly, a court must give "substantial deference" to an agency's interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). An agency's "interpretation of its regulations would be entitled to 'controlling weight unless it was plainly erroneous or inconsistent with the regulation.'" *Forest Watch v. U.S. Forest Service*, 410 F.3d 115, 117-18 (2d Cir. 2005) (quoting *New York Currency Research Corp. v. CFTC*, 180 F.3d 83, 88 (2d Cir. 1999)). "Because applying an agency's regulation to complex and changing circumstances calls upon the agency's unique expertise and policy-making prerogatives, [courts] presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Martin v. Occupational Safety & Health Review Comm.*, 499 U.S. 144, 151 (1991).

Indeed, as the Supreme Court has emphasized, an administrative agency "should be free to fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous duties." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) (quotations omitted). Further, "judicial deference to the Executive Branch is especially appropriate in the immigration context." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999).

Here, the statutory scheme requires that the agency conduct a "personal investigation," 8 U.S.C. § 1446(a), that includes a "full criminal background check," Pub L. No. 105-119. In turn, the agency has published a regulation implementing the Congressional mandate -- 8 C.F.R.

5

§ 335.2. That regulation requires the completion of both "administrative" and "criminal" checks. *See* 8 C.F.R. §§ 335.2(b)(1), (b)(2). In the course of carrying out its mission, the DHS interpreted the regulation's requirement that it obtain a "full criminal background check" from the FBI, including whether the applicant has an "administrative" or "criminal" record, to require the completion of, among other things, an FBI name check. *See* USCIS Fact Sheet, Immigration Security Checks – How and Why the Process Works (attached hereto as Exh. A, and found at www.uscis.gov); *see also Antonishin v. Keisler*, No. 06 Civ. 2518, 2007 WL 2788841, at *7 (N.D. Ill. Sept. 20, 2007) (holding that DHS had proper authority to include the FBI name check as part of the "full criminal background check"). The *Mocanu* court erred in failing to defer to the DHS's determination that a "full criminal background check," required by 8 C.F.R. § 335, requires the agency to request both a fingerprint check and a name check from the FBI.[2]

Unlike *Mocanu*, all other courts that have construed 8 C.F.R. § 335 have interpreted the provision to authorize the DHS to include the FBI name check as part of the required "full

---

[2]     Even in cases where *Chevron* deference may not be applicable, another type of deference is available to an agency interpretation of its governing statutes or regulations. *See U.S. v. Mead Corp.*, 533 U.S. 218, 234 (2001). Years before *Chevron*, the Supreme Court decided how courts should treat non-binding agency interpretations, recognizing that "while not controlling upon the courts by reason of their authority, [these interpretations] do constitute a body of experience." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (giving deference to interpretations contained in agency manuals); *see also In re New York Times Sec. Serv.*, 371 F.3d 68, 82-83 (2d Cir. 2004).

Under *Skidmore*, an agency's interpretation will merit deference depending upon the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Oregon v. Gonzales*, 546 U.S. 243, 268 (2006) (citing *Skidmore*, 323 U.S. at 140). Where, as here, (1) CIS has uniformly construed section 8 U.S.C. § 335.2 to require the FBI name check as part of the required "full criminal background check," *see* Cannon Decl. ¶ 22; (2) the former INS required an FBI name check as part of the required investigation, *see id.* ¶ 23; and (3) courts have consistently upheld CIS's interpretation of the regulation, CIS's longstanding interpretation is entitled to deference by the courts. Deference must be accorded to the agency's interpretation of the statutory scheme, and the *Mocanu* court erred by failing to accord any level of deference.

6

criminal background check." *Wang v. Gonzales*, No. 07-02272, 2008 WL 45492, at *2 (D. Kan.

Jan. 2, 2008); *Morral v. Gonzales*, No. 07-2736, 2007 WL 4233069, at *1, n.2 (D. Minn. Nov.

28, 2007); *Stepchuk v. Gonzales*, No. C06-570RSL, 2007 WL 185013, at *2 (W.D. Wash. Jan.

18, 2007); *Aman v. Gonzales*, No. 06-1159, 2007 WL 2695820, at *3 (D. Colo. Sept. 10, 2007);

*Shalabi v. Gonzales*, No. 06-866, 2006 WL 3032413, at *2 (E.D. Mo. Oct. 23, 2006). In holding

that the FBI name check may be considered part of the "full criminal background check"

required by 8 C.F.R. § 335.2(b), courts have noted that "[b]ecause § 335.2(b) uses the term

'includes' to define a background check, the conditions that follow that term are not exhaustive."

*Aman*, 2007 WL 2695820, at *3 (quoting *Stepchuk*, 2007 WL 185013, at *2; *Shalabi*, 2006 WL

3032413, at *2).

### 2. The *Mocanu* Court Impermissibly Usurped an Administrative Function

Based in part on its flawed interpretation of the statutory scheme, the *Mocanu* court

enjoined the DHS from using the name check in adjudicating the plaintiffs' N-400 applications

unless the DHS initiates a notice-and-comment procedure regarding its use of the FBI name

check. *See Mocanu*, 2008 WL 372459, at *16-*18. This extraordinary remedy, however,

impermissibly usurped the agency's function. The Supreme Court has held that courts do not

have the power to exercise an essentially administrative function. *Federal Power Comm'n v.

Idaho Power Co.*, 344 U.S. 17, 20 (1952)) ("*FPC*"). What the *Mocanu* court ordered - that the

DHS adjudicate naturalization applications without receiving a response from the background

check - essentially is equal, in contravention of *FPC*, to issuing a "license without a condition":

in this case, citizenship without the requirement of the background check required by 8 C.F.R.

§ 335. To allow someone to acquire citizenship without the FBI being able to fully vet the

potential security risk posed by that person - a check put in place specifically to protect the

7

nation's security after September 11, 2001 – impermissibly usurps the DHS's role in

administering immigration benefits.[3]

The APA does not require agencies to follow notice-and-comment procedures in all

situations. Rather, 5 U.S.C. § 553(b)(3) specifically exempts "interpretive rules, general

statements of policy, or rules of agency organization, procedure, or practice" from the

requirement. DHS interprets 8 C.F.R. § 335.2 to require a name check as part of the "full

criminal background check," and so it is an "interpretive" rule rather than a "legislative" rule

under the APA. *See New York State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267

F.3d 128, 131 (2d Cir. 2001) ("legislative rules are those that create new law, right, or duties, in

what amounts to a legislative act. Interpretive rules, on the other hand, do not create rights, but

merely clarify an existing statute or regulation.") (quotations omitted). In this case, the DHS

decision to require a name check, including searches of reference files, did not work substantive

changes to the naturalization process. Accordingly, the requirement of an FBI name check is an

interpretive rule that does not require notice-and-comment rulemaking. *See Ahmadi v. Chertoff*,

2007 WL 3022573, at *8-*9 (N.D. Cal. Oct. 15, 2007) (finding that expanded scope of FBI name

check was an interpretative rule that did not require notice-and-comment under APA).

C.      **Even If the DHS Were Not Precluded from Adjudicating Plaintiff's
        Naturalization Application, Mandamus Jurisdiction Would Fail
        Because the DHS Owes No Nondiscretionary Duty**

As described in the Government's moving brief, mandamus is an extraordinary writ that

can only issue to compel the performance of a "clear nondiscretionary duty." *See* Govt. Mem. at

5-9. In response to the Government's demonstration that the DHS owes no clear

---

[3]  The potential danger posed by the *Mocanu* court's February 8, 2008 order appears to have
been alleviated by a subsequent revision to that order, dated February 27, 2008. *See Mocanu v.
Mueller*, No. 07-0445, slip op. (E.D. Pa. Feb. 27, 2008), attached as Exh. B hereto.

nondiscretionary duty to act on his naturalization application at this time, plaintiff's opposition fails to identify any valid basis for such a duty. Indeed, as described in section I(A), *supra*, not only is there no duty for the DHS to act, but the agency is prohibited from acting on plaintiff's N-400 application while the FBI background name check is pending.

Even if the DHS were permitted to act on his N-400 application at this time, the DHS would not be under a clear nondiscretionary duty to do so. Plaintiff admits that he has not yet been interviewed by the DHS and therefore cannot assert that the agency must act pursuant to 8 U.S.C. § 1447(b). *See* Pl. Opp. at 16. Section 1447(b) is the only timeliness requirement that Congress applied to DHS's adjudication of naturalization applications, and its 120-day deadline is triggered by a DHS interview that can be conducted *only after* the FBI background name check is completed. Because the DHS is not obligated "to act by a date certain" in processing a naturalization applicant's background name check while the FBI name check is pending, the DHS owes no nondiscretionary duty that could support mandamus jurisdiction. *See Cronin v. Browner*, 898 F. Supp. 1052, 1059 (S.D.N.Y. 1995) ("A non-discretionary or mandatory duty arises only where an agency bears a duty to act by a date certain") (citing *Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987)); *see also NRDC v. Thomas*, 885 F.2d 1067, 1075 (2d Cir. 1989) (distinguishing between statutory provisions that include stated deadlines and those that do not) (citing *Environmental Defense Fund v. Thomas*, 870 F.2d 898, 897 (2d Cir. 1989)).

Plaintiff appears to argue that because an N-400 application is accompanied by an application fee, the Government has a duty to adjudicate the application within the 18 months that have passed since plaintiff's application was filed. *See* Pl. Opp. at 8-9. There is simply no basis, however, to conclude – and plaintiff cites no authority for the proposition – that the presence of an application fee requires an adjudication be concluded within an 18-month period.

9

Plaintiff also cites a handful of cases, mostly from district courts in Pennsylvania, finding mandamus jurisdiction over naturalization or adjustment of status applicants. *See* Pl. Opp. at 4-5, 14-18. Those cases were wrongly decided because they fail to recognize that the DHS owes no nondiscretionary duty and is actually prohibited from adjudicating an N-400 application while the FBI name check is pending. As the Government's moving brief explained, there has not been any circuit court decision on this issue and the district courts have diverged. Plaintiff fails to offer any persuasive reason to rule against the many courts that have dismissed naturalization applicants' mandamus complaints for lack of jurisdiction. *See* Govt. Mem. at 7-9.[4]

Plaintiff cites two cases from this District that are inapposite. *See* Pl. Opp. at 17. *Kim v. Ashcroft*, 340 F. Supp. 2d 384 (S.D.N.Y. 2004), concerned an applicant for adjustment of status whose application was pending for three-and-a-half years. While the court did not find this delay unreasonable on the motion to dismiss, it retained jurisdiction to consider whether it was reasonable under the circumstances. *See id.* at 393-94. Significantly, unlike Mr. Kakushadze's naturalization application, Kim's adjustment application was not governed by Pub L. No. 105-119, prohibiting adjudication of his application until an FBI "full criminal background check has been completed." In any event, *Kim*'s much longer delay does not support jurisdiction here, where the time period at issue is well under two years. *American Academy of Religion v. Chertoff*, 463 F. Supp. 2d 400 (S.D.N.Y. 2006) is similarly distinguishable. In that case, the court entertained jurisdiction over a claim involving the visa application process because the

---

[4] Plaintiff contends that the Government's challenge to jurisdiction over this action is more properly an allegation that plaintiff has failed to state a valid cause of action. *See* Pl. Opp. at 2-3. Plaintiff overlooks that, as plaintiff, he carries the burden to demonstrate that subject matter jurisdiction is present, and courts must dismiss complaints seeking mandamus relief where an agency has no duty to act. *See, e.g., Espin v. Gantner*, 381 F. Supp. 2d 261, 265 (S.D.N.Y. 2005) (dismissing mandamus complaint of applicant for adjustment of status based on lack of jurisdiction and citing numerous cases from the Southern District of New York).

agency had caused potentially indefinite delay pending "possible future statements" by the plaintiff. *See id.* at 421-22. Notably, the visa applicant did not have standing to raise a claim that he was entitled to a visa adjudication; rather, the case involved a claim by groups claiming that their First Amendment right to hear the visa applicant was being violated by the delay.

While plaintiff contends that the Government may delay adjudicating plaintiff's N-400 indefinitely, *see* Pl. Opp. at 12 & 15, there is no reason to credit this assumption. The declarations submitted to the Court by the Government describe the standard process that is being administered regarding the adjudication of plaintiff's application, as well as the reasons applications may take months or years to process. Due to an increased number of applicants, the FBI is processing millions of name checks per year, and some cases take longer than others based on "hits" that need to be manually investigated. *See* Cannon Decl. ¶¶ 22, 26-30, 41; Bijolle Decl. ¶ 13. Plaintiff's accusation of indefinite delay is premature. *See Saleh v. Ridge*, 367 F. Supp. 2d 508, 513 (S.D.N.Y. 2005) ("Plaintiff's concern that CIS could delay adjudication indefinitely is premature. . . Plaintiff has provided no evidence to show that CIS will refuse to adjudicate his application altogether. Nor has Plaintiff provided any compelling rationale for why he should not be made to wait his turn for adjudication.").[5]

### D.     No APA Jurisdiction Exists Because There Is No Unreasonable Delay

As set forth in the Government's moving brief, the APA does not support this Court's exercise of jurisdiction over plaintiff's claims against the DHS because the agency has not failed

---

[5] Plaintiff argues that the DHS should "expedite" his name check for "humanitarian reasons" relating to his family. *See* Pl. Opp. at 22-24. While plaintiff may have good reasons for desiring a faster adjudication of his N-400 application, many other applicants who filed earlier than plaintiff do also. The DHS has certain criteria to determine when an "expedited" name check should be processed, *see* Bijolle Decl. ¶ 13, and courts should defer to the agency and not rewrite the DHS's expedition policy. *See Wang v. Gonzales*, No. 07-02272, 2008 WL 45492, at *3 (D. Kan. Jan. 2, 2008); *Antonishin v. Keisler*, No. 06 Civ. 2518, 2007 WL 2788841, at *5 (N.D. Ill. Sept. 20, 2007).

to take any action it was "required to take." *See* Govt. Mem. at 9-10. Plaintiff's opposition suggests that 18 months is an unreasonable amount of time to adjudicate his N-400 application and cites several cases purportedly in support of his contention. *See* Pl. Opp. at 10-14. The case law, however, belies plaintiff's contention.

Congress created only one timeliness requirement governing the DHS's adjudication of naturalization applications, 8 U.S.C. § 1447(b), which is not applicable here. *See* Pl. Opp. at 16. The presence of this deadline in one portion of the statute, however, "counsel[s] against judicial intervention [under the APA]" because courts "must conclude that Congress' failure to impose deadlines elsewhere was not inadvertent." *Sierra Club v. Thomas*, 828 F.2d 783, 797 n.99 (D.C. Cir. 1987).

The case law cited by plaintiff is inapposite. The circuit court cases plaintiff cites (*see* Pl. Opp. at 10) actually undercut plaintiff's claim that APA jurisdiction exists when an agency's action has been pending for less than two years. *See Friends of the Bow v. Thompson*, 124 F.3d 1210, 1221 (10th Cir. 1997) (denying APA claim, stating "courts have declined to overturn agency action on the basis of the delay in situations where the agency took much longer to respond than the approximately one year period at issue here") (citing cases); *Litton Microwave Cooking Prods. v. NLRB*, 949 F.2d 249, 253 (8th Cir. 1991) (finding six-year delay of agency decision not unreasonable under APA); *Sierra Club*, 828 F.2d at 798-99 (dismissing APA claim against agency "without prejudice to renewal should circumstances so warrant" because less than three years "can hardly be considered unreasonable"); *Estate of French v. FERC*, 603 F.2d 1158, 1167-68 (5th Cir. 1979) (declining to award interest because seven-year delay was unreasonable); *Silverman v. NLRB*, 543 F.2d 428, 430 (2d Cir. 1976) (greater than five years of agency inaction

warranted jurisdiction). Similarly, none of the district court cases plaintiff cites (*see* Pl. Opp. at 11-14) supports APA jurisdiction when an agency's action has been pending only 18 months.

In the Second Circuit, to determine whether an agency's action has taken an unreasonable amount of time pursuant to section 6(b) of the APA, 5 U.S.C. § 555(b), courts "look to the source of delay – e.g., the complexity of the investigation as well as the extent to which the defendant participated in delaying the proceeding." *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 120 (2d Cir. 1999) (finding a three-year delay not unreasonable). Here, adjudicating plaintiff's N-400 application, including the need for the FBI to manually review files for "hits" concerning plaintiff's name check, has reasonably taken well under two years to adjudicate. An 18-month period of time cannot be the basis for a finding of unreasonable delay under the APA. *See Li v. Chertoff*, No. 07-CV-3836, 2007 WL 4326784, at *6 (E.D.N.Y. Dec. 7, 2007) ("delay of approximately 16 months since [plaintiff's] motion for reconsideration [of application for adjustment of status] was filed is not remotely in the range that has been held by other courts to be 'unreasonable' for purposes of the APA") (citing cases); *Saleh v. Ridge*, 367 F. Supp. 2d 508, 513 (S.D.N.Y. 2005) (finding delay of almost five years for adjustment of status application not unreasonable).

## II.    PLAINTIFF'S CLAIMS AGAINST THE FBI SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

Plaintiff's opposition simply fails to address the reasons set forth in the Government's initial memorandum for dismissing his claims against the FBI for lack of subject matter jurisdiction. *See* Govt. Mem. at 10-13. Neither the mandamus statute nor the APA supplies jurisdiction because the FBI does not owe a "clear nondiscretionary duty" to complete a background name check in a particular amount of time or in less time than has elapsed in plaintiff's case. Because the FBI is not obligated "to act by a date certain" in processing a

naturalization applicant's background name check, the FBI owes no nondiscretionary duty that could support mandamus jurisdiction. *See Cronin v. Browner*, 898 F. Supp. 1052, 1059 (S.D.N.Y. 1995) (citing *Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987)); *see also NRDC v. Thomas*, 885 F.2d 1067, 1075 (2d Cir. 1989) (citing *Environmental Defense Fund v. Thomas*, 870 F.2d 898, 897 (2d Cir. 1989)).

Plaintiff fails to identify any authority for his contention that the FBI has a nondiscretionary duty to process background name checks for naturalization applicants in a particular amount of time. *See* Pl. Opp. at 18-21. In fact, with respect to the claims against the FBI, plaintiff's opposition cites only the *Mocanu* decision, *see* Pl. Opp. at 20-21, which actually dismissed all the claims against the FBI, holding:

> Because the record shows that the institution of the name check is exclusively under USCIS, and that the FBI merely acts as requested and/or directed by USCIS, it is clear that the FBI should not be a defendant in these cases, and the Court's Order following this Memorandum will provide for dismissal of the FBI and its officials who have been named as defendants in these cases.

2008 WL 372459, at *9. This finding is consistent with the many cases cited in the Government's moving brief holding that there is no jurisdiction against the FBI because no regulation prescribes the pace at which the FBI must conduct background name checks for naturalization applicants. *See* Govt. Mem. at 10-11; *see also Wang v. Gonzales*, No. 07-02272, 2008 WL 45492, at *2-*3 (D. Kan. Jan. 2, 2008).

Even assuming *arguendo* that the FBI did have a nondiscretionary duty to conduct plaintiff's background check within a prescribed time period, plaintiff fails to dispute the case law cited in the Government's moving brief establishing that less than two years is not an unreasonable amount of time for the FBI to process a background check. *See* Govt. Mem. at 12-13. Plaintiff's bald assertion that the process has taken "an unreasonable amount of time *prima*

14

*facie*," *see* Pl. Opp. at 20, is unsupported and contrary to law. Plaintiff's accusations that the FBI

name check is "arbitrary and capricious" and "can more easily hinder national security," *see id.*,

are similarly baseless and meritless. It is well established that it is the role of the Executive

Branch to "'exercise the expertise of protecting national security,'" and "'[i]t is not within the

role of the courts [or a plaintiff] to second-guess executive judgments made in furtherance of that

branch's proper role.'" *Bismullah v. Gates*, 501 F.3d 178, 187-88 (D.C. Cir. 2007) (quoting *Ctr.*

*for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003)).[6]

      Accordingly, the Court should dismiss plaintiff's claims against the FBI for lack of

subject matter jurisdiction.

## CONCLUSION

      For these reasons, and for the reasons raised in the Government's initial brief, the Court

should grant the Government's motion to dismiss plaintiff's complaint in its entirety.

---

[6] Plaintiff also asserts that, contrary to the Declaration of Michael Cannon, the FBI does not utilize a "first-in, first-served protocol" in processing name checks. *See* Pl. Opp. at 21-22. Plaintiff's assertion is not only irrelevant to the question of whether the FBI owes a nondiscretionary duty or unreasonably delayed its action, but is also inaccurate. While some name checks are processed and completed more quickly than others (*e.g.*, because the name does not yield any electronic "hits" that require manual review of paper files, *see* Cannon Decl. ¶ 18, or because the name was expedited based on CIS criteria, *see id.* at 19), the FBI is processing the name check request for plaintiff using the normal first-in, first-served protocol. *See* Cannon Decl. ¶ 41. The fact that the FBI's software system was not designed to display a queue-ordered list of name check applicants, does not "annihilate" or even affect – contrary to plaintiff's allegation (at Pl. Opp. 22) – the fact that the FBI will conduct the manual file review of plaintiff's name check after those applicants who temporally preceded plaintiff and before those who applied subsequently. *See* Cannon Decl. ¶ 15.

Dated: New York, New York
      March 19, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants

By:     DANIEL P. FILOR
       Assistant United States Attorney
       86 Chambers Street
       New York, New York 10007
       Tel.: (212) 637-2726
       Fax:  (212) 637-2717

16

# EXHIBIT A

*Press Office*
**U.S. Department of Homeland Security**



**U.S. Citizenship
and Immigration
Services**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Immigration Security Checks—How and Why the Process Works

---

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—** FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—** FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VICTOR MOCANU | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ROBERT S. MUELLER, et al. | : | NO. 07-0445 |

---

| | | |
|---|---|---|
| MOHAMMAD BARIKBIN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, et al. | : | NO. 07-3223 |

---

| | | |
|---|---|---|
| TONGZIAO ZHANG | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL CHERTOFF, et al. | : | NO. 07-2718 |

---

| | | |
|---|---|---|
| ANDREW O. NEWTON, M.D. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DONALD MONICA, et al. | : | NO. 07-2859 |

## MEMORANDUM AND ORDER

Defendants filed an Emergency Motion for Stay Pending Appeal of this Court's Order, dated February 8, 2008, and the Plaintiffs have filed a response.  The Court held a hearing on February 27, 2008 in open court.

Although Defendants' counsel presented many arguments as to why a stay should be granted, no appeal has been filed.  They advise that the issue of whether to appeal is under review

by the Solicitor General's Office and, therefore, the Court should grant a stay to allow more time to consider whether an appeal will actually be filed. Without necessarily agreeing that the matter is an emergency or otherwise ripe for decision, the Court will consider the merits of the Motion.

Defendants assert most vigorously that they have satisfied the requisites for a stay, that the Court erred in its legal conclusions and in the relief granted, and the United States Citizenship and Immigration Services ("USCIS") will suffer irreparable harm unless a stay is granted pending an appeal. Plaintiffs dispute the Defendants' contentions.

One of the points of contention is the interpretation of paragraph 7 in the Court's Order of February 8, 2008. Defendants assert that the phrasing of the Order has prevented USCIS from adjudicating any of these Plaintiffs' petitions because it could not consider the result of the Federal Bureau of Investigation ("FBI") name check without instituting the notice and comment procedure, leading to new regulations, which USCIS is apparently unwilling to do without exercising its appellate rights.

Counsel for USCIS then advised the Court that although USCIS recently received the results of the FBI name check for these four Plaintiffs, because of the phrasing of paragraph 7 of the February 8, 2008 Order, USCIS took the position it could not review those results, and did not know what the results were. Upon learning this fact, Plaintiffs' counsel agreed that it would be in their clients' interest for the Court to rephrase paragraph 7 and to give the Defendants some reasonable time to review the results of the FBI name check. If the name check did not reveal any derogatory information, the Plaintiffs presumably would be promptly interviewed, and assuming all requisites for naturalization have been met, their petitions would be adjudicated and the Plaintiffs would be naturalized, thus arguably making these cases moot. The record will

reflect that the Defendants' counsel did not make any commitments or promises as to any specific action in any specific case.

Nonetheless, all counsel and parties agreed that the Order of February 8, 2008 should be revised as follows:

AND NOW, this _____ day of February, 2008, following a hearing in open court and for reasons stated on the record, it is hereby ORDERED that paragraphs 7, 8 and 10 of the Court's Order dated February 8, 2008 shall be revised, with the same numbered paragraphs, and paragraph 11 will be added, as follows:

7.    As of March 28, 2008, unless USCIS has initiated a notice and comment procedure pursuant to the Administrative Procedure Act concerning its use of the FBI name check procedure, it shall be enjoined from using the FBI name check program as a factor in the decision making as to these Plaintiffs.

8.    The parties shall file reports no later than March 31, 2008 as to their position.

10.    The Court will schedule a hearing as may be necessary or appropriate.

11.    The Defendants' Emergency Motion for Stay Pending Appeal is DENIED, without prejudice.

BY THE COURT:

s/Michael M. Baylson

Date: ___2/27/08_____        _____

Michael M. Baylson, U.S.D.J.

-3-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
ZURAB KAKUSHADZE, A# 78-704-408,          :

                    Plaintiff,            :
                                          :
        -against-                         :          07 Civ. 8338 (DCF)
                                          :
MICHAEL CHERTOFF, Secretary of the        :          Certificate of Service
Department of Homeland Security, and      :
ROBERT MUELLER, Director, Federal Bureau  :
of Investigation,                         :
                                          :
                    Defendants.           :
------------------------------------------------------------ x

        I, DANIEL P. FILOR, an Assistant United States Attorney for the Southern District of

New York, hereby certify that on March 19, 2008, I caused a copy of Defendants' Reply

Memorandum of Law in Further Support of Defendants' Motion to Dismiss to be served by

Federal Express upon counsel for plaintiff at the below address:

        Jan H. Brown, Esq.
        Law Offices of Jan H. Brown, P.C.
        1150 Avenue of the Americas, Suite 700
        New York, New York 10036
        *Attorney for Plaintiff*

                                          Daniel P. Filor

                                          Daniel P. Filor